A06A0607. IN THE INTEREST OF S. W. J. P. D. III et al., children.
(630 SE2d 824)

MIKELL, Judge.

The mother of S. W. J. P. D. III, and D. L. L., Jr., appeals from the juvenile court's order terminating her parental rights. She contends that the juvenile court erred because there was a lack of clear and convincing evidence (i) of current deprivation or the likelihood of deprivation in the future, and (ii) that termination of her parental rights was in the children's best interests. We disagree and affirm.

> In considering a challenge to the sufficiency of the evidence supporting an order terminating parental rights, this Court is required to view the evidence in the light most favorable to the appellee, here the [Glynn County Department of Family and Children Services (the "Department")], and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights have been lost. We do not weigh the evidence or determine the credibility of the witnesses but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.

(Footnotes omitted.) *In the Interest of S. T.*, 244 Ga. App. 86, 87 (1) (534 SE2d 813) (2000).

---

So viewed, the evidence shows that on December 13, 2000, the Department received a complaint from police that the almost two-year-old S. W. J. P. D. had been found alone near a public street while the mother was at home in bed. The next day, the Department took S. W. J. P. D. into protective custody and filed a deprivation petition. The juvenile court issued a consent order on January 2, 2001, reflecting that the mother had stipulated to S. W. J. P. D.'s deprivation by reason of neglect and inadequate supervision. The child was placed in the temporary custody of the Department. The juvenile court also found S. W. J. P. D. to be deprived in its orders of January 30, 2003, and April 13, 2004, in which the cause of deprivation was determined to be the "mental/physical impairment of parent."

D. L. L. was born in August 2004. Shortly thereafter, the Department took the child into protective custody and filed a deprivation petition. The mother stipulated to the petition's allegations, and in an order dated September 2, 2004, the juvenile court found D. L. L. to be deprived for reasons of "neglect/inadequate housing" and "mental/physical impairment of parent." The juvenile court placed D. L. L. in the temporary custody of the Department. On September 8, 2004, the Department filed a petition to terminate the mother's parental rights to the children.

At the termination hearing on November 10, 2004, the Department's case manager testified that the primary obstacle to the mother's reunification with the children was her mental health. Evidence of the mother's mental health problems was introduced through a psychological evaluation performed by Dr. Krop, a licensed psychologist. According to Dr. Krop, the mother showed a high "probability of dysfunctional behavior," appeared to be "blaming the child," and had developed "an excessive degree of detachment" with respect to S. W. J. P. D. Dr. Krop diagnosed the mother with

> Obsessive-Compulsive Disorder and Major Depression, Recurrent, Severe. Overall, this woman presents as a severely disturbed individual totally lacking in insight as to how her long-standing maladaptive behavior pattern and personality traits will impact on her parenting. Although this woman would not likely engage in behavior to intentionally harm her children, [her disorder] would significantly interfere with her capacity to provide for the needs of a child.

Dr. Krop described the mother's prognoses in therapy to be poor.

The mother's caseworker testified that one of the mother's goals under her reunification plan was to consistently follow treatment recommended by physical and mental health providers. However, the

mother's attendance at scheduled therapy sessions was sporadic, and the mother did not consistently take her prescribed medication.

The mother's caseworker also testified that under the mother's reunification plan the mother was required to maintain safe and appropriate housing. During visits to the mother's apartment, however, the caseworker observed newspapers and advertisements stacked on the floor and on the sofa and boxes in the kitchen. She saw spider webs on the walls and in the corners, mold and mildew on the bathroom walls, bags of garbage in the kitchen, and a "big container" on the coffee table full of different medications.

The caseworker further testified that S. W. J. P. D. had made tremendous improvements in foster care, and that he had been placed with foster parents who had expressed an interest in adoption. According to the caseworker, the foster parents had also expressed an interest in adopting D. L. L.[1] The caseworker testified that S. W. J. P. D. was bonded with his foster parents and knew the mother only as "the lady that comes to see him."

The mother's cousin testified that she and other family members had taken care of the mother because the mother did not take care of herself. The grandmother had previously paid the mother's rent and managed her bills, although the grandmother had "cut [the mother] off" several months before the hearing. According to the cousin, the mother is a "pack rat" who keeps newspapers and other material piled up in her apartment to the extent the cousin believed it to be a fire hazard.

D. L. L.'s father testified that he had been living with the mother for the past seven to nine months, and that she had gotten "behind" in paying the bills. According to the father, the mother had a habit of accumulating things, and although he did as much as he could to clean the apartment, "stuff" kept reappearing after it was cleaned away. The father believed the mother's apartment was not a suitable environment for a child. The mother's cousin and D. L. L.'s father both testified that in their opinion the mother could not take care of her children.

Following the termination hearing, the juvenile court entered an order on December 14, 2004, terminating the mother's parental rights to the children. In *In the Interest of S. W. J. P. D.*, 275 Ga. App. 272 (620 SE2d 497) (2005), we vacated that order and remanded the case with direction that the juvenile court make appropriate findings of fact and conclusions of law and enter a judgment based thereon. Id.

---

[1] After the first appeal was remanded, the juvenile court learned that the foster mother no longer wanted to adopt D. L. L. The juvenile court held a status conference and found that "by that time, the new placement with the current 'foster to adopt' couple had already been made."

at 273. On October 6, 2005, the juvenile court entered a new order terminating the mother's parental rights to the children, and the mother appeals from this order.

1. The mother claims that the juvenile court erred in terminating her parental rights because there was a lack of clear and convincing evidence showing that the children were currently deprived and that they would likely be deprived in the future. We disagree.

Termination of parental rights is a two-step process requiring that the juvenile court determine (1) that there is present clear and convincing evidence of parental misconduct or inability; and (2) that termination of parental rights is in the best interest of the children. OCGA § 15-11-94 (a). A determination of parental misconduct or inability requires findings that (1) the children are deprived; (2) the deprivation is caused by lack of proper parental care or control; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation will likely cause serious physical, mental, emotional, or moral harm to the children. See OCGA § 15-11-94 (b) (4) (A); *In the Interest of C. N. S.*, 248 Ga. App. 84, 85 (545 SE2d 633) (2001).

(a) "Because the mother did not appeal the juvenile court's orders finding that [S. W. J. P. D. and D. L. L. were] deprived, she is bound by that determination." (Citation omitted.) *In the Interest of T. P.*, 270 Ga. App. 700, 704 (1) (608 SE2d 43) (2004).

(b) In determining whether a child is without proper parental care or control, the juvenile court was required to consider "[a] medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." OCGA § 15-11-94 (b) (4) (B) (i). See *In the Interest of A. K.*, 272 Ga. App. 429, 434 (1) (a) (612 SE2d 581) (2005). Evidence showed that the mother suffered from a medically diagnosed mental illness, specifically from obsessive-compulsive disorder and major depression, and that a psychologist concluded that her mental illness would significantly interfere with her ability to adequately provide for her children's needs. Witnesses testified as to the mother's compulsive need to collect things in her apartment to the extent it created a fire hazard and an environment unsuitable for children, that the mother was unable to care for herself, and that when S. W. J. P. D. was in the mother's custody, he was found outside unattended while the mother was at home in bed. Accordingly, we conclude that any rational trier of fact could have found by clear and convincing evidence that the children's deprivation was caused by lack of proper parental care or control. See *In the Interest of S. G.*, 271 Ga. App. 776, 780 (611 SE2d 86) (2005) ("[a] mental disability that renders a parent incapable of caring for the child is a valid legal basis for termination") (citation and punctuation omitted).

(c) Evidence showed that the mother did not consistently take her medication, that her appearance for scheduled treatment for her mental disorder was sporadic, and that Dr. Krop considered her prognoses for improvement to be poor. "The juvenile court could properly consider the mother's unwillingness to consistently treat her mental or physical conditions as factors in concluding that the deprivation was likely to continue." (Citation omitted.) *In the Interest of K. N.*, 272 Ga. App. 45, 54 (a) (3) (611 SE2d 713) (2005). Thus, any rational trier of fact could have found by clear and convincing evidence that the deprivation was likely to continue.

(d) The mother's caseworker testified that in her opinion the mother's current relationship with the children was detrimental and that continuing the relationship would be harmful to the children. Dr. Krop's report was also negative in tone, describing the mother as "seriously disturbed" and that her profile suggested "a paranoid disposition." Dr. Krop suggested that "termination of [the mother's] parental rights should be seriously considered." In view of the foregoing, we conclude that any rational trier of fact could have found by clear and convincing evidence that continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to the children. See, e.g., *In the Interest of M. J. T.*, 255 Ga. App. 553, 556 (565 SE2d 877) (2002) (evidence which included the father's mental problems and refusal to take medication or attend counseling sessions supported a finding that the child would suffer harm if returned to the father).

2. The mother claims that there was a lack of clear and convincing evidence that termination of parental rights was in the best interest of her children. We disagree. "If there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child." OCGA § 15-11-94 (a). The same evidence showing parental misconduct or inability may establish this requirement. See *In the Interest of J. B. A.*, 230 Ga. App. 181, 185 (2) (495 SE2d 636) (1998). Given the evidence of the mother's mental illness, her poor prognoses for improvement, and her inability to care for herself or her children, and given that S. W. J. P. D. had improved in foster care, and that both children had been placed with "foster to adopt" foster parents, the trial court did not abuse its discretion in finding that termination of the mother's parental rights was in the children's best interest. See *In the Interest of M. L. P.*, 236 Ga. App. 504, 510 (1) (d) (512 SE2d 652) (1999) (juvenile court has broad discretion in determining how the interest of the child is best served).

*Judgment affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED MAY 5, 2006.

*Donald C. Gibson*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, James A. Chamberlin, Jr.*, for appellee.

