A06A1615. IN THE INTEREST OF H. E. M. O., a child.
(636 SE2d 45)

MIKELL, Judge.

Appellant mother appeals the termination of her parental rights to H. E. M. O., challenging the sufficiency of the evidence. We affirm for the reasons set forth below.

> In considering a challenge to the sufficiency of the evidence supporting an order terminating parental rights, this Court is required to view the evidence in the light most favorable to the appellee, here the Bartow County Department of Family and Children Services (the "Department"), and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights have been lost. We do not weigh the evidence or determine the credibility of the witnesses but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.[1]

Properly viewed, the evidence shows that H. E. M. O., who was born on October 28, 1998, was placed into the Department's custody along with her younger brother[2] on May 28, 2004. The order for shelter care recites that the children's father was in residential care

---

[9] *Milhollin v. Salomon Smith Barney, Inc.*, 272 Ga. App. 267, 273 (2) (b) (612 SE2d 72) (2005).

[10] See *Hammer Corp.*, supra at 217-218.

[1] (Citation and punctuation omitted.) *In the Interest of S. L. B.*, 265 Ga. App. 684 (595 SE2d 370) (2004).

[2] The Department is not seeking to terminate the mother's parental rights to this child.

in the end stages of a terminal illness and that the mother was emotionally unstable, possibly abusing substances, and was not caring for the children properly. The juvenile court found the children deprived following a 72-hour hearing, which the mother did not attend. In that order, the court noted that the Department had made reasonable efforts to preserve the family by paying utilities, offering child care, providing homestead and parent aide services, referring the children for evaluation, and referring the mother to counseling. Ten days later, the court entered a provisional order placing the children in the temporary custody of the Department. The father had died, and the mother stipulated that the children were deprived due to the following conditions: the mother's mental impairment, incarceration on theft charges, inadequate housing, unstable employment, and substance abuse. The court directed the Department to prepare a reunification plan requiring the mother to become and remain drug and alcohol free, complete a substance abuse evaluation and follow any recommendations made, submit to random drug screens, complete a psychological evaluation and follow any recommendations made, obtain and maintain stable housing and employment, complete parenting classes and demonstrate skills learned, resolve pending legal issues and commit no further legal violations, and maintain a bond with the children by regular, supervised visitation. A supplemental order incorporating the case plan was entered on July 6, 2004, which additionally required the mother to visit the children at least twice a month, to cooperate with the Department, and to notify the Department of any change in address or employment within 48 hours.

The court entered a final dispositional order on August 9, 2004, incorporating the provisional order awarding temporary custody to the Department. The following year, on May 26, 2005, the court entered an order extending custody in the Department. The mother, who was incarcerated in Alabama, attended the hearing by telephone and consented to the order. The permanency plan for H. E. M. O. was changed to adoption following termination of parental rights, with the petition to be filed by August 25, 2005. The court concluded that the mother had made insufficient progress on the case plan to continue reunification efforts.

The petition to terminate the mother's parental rights to H. E. M. O. was filed on September 7, 2005, and the hearing was held on November 15, 2005. At the time of the hearing, the mother had been jailed for two weeks for violating the conditions of her probation by using cocaine; she admitted that she had previously been incarcerated in Alabama for six months and had not been drug free, as required by her case plan, "on several occasions"; that she failed a random drug screen in March 2005; that she had not enrolled in an inpatient drug treatment program, although recommended as part of

her case plan, because she was uninsured; that she did not ask her case manager, Jennifer Moore, for assistance in entering such a program; that she did not attempt to obtain residential mental health treatment because she was homeless and did not know whom to ask; that once she gets out of jail, she will still be homeless; that since H. E. M. O. came into the Department's custody, the mother had been employed for only one month, driving a cab; that she did not complete the case plan goal of attending parenting classes because she had been incarcerated; and that she had been arrested three times since H. E. M. O. was removed from her custody. Concerning the case plan goal of maintaining visitation with both children, the mother acknowledged that she did not try to see them following her release from custody in Alabama, even though her son was upset about it. The mother testified that she explained to her caseworker that she was not ready to see H. E. M. O. She also testified she had borne six children, none of whom remained in her custody. Of the four children besides H. E. M. O. and her younger brother, two were adopted, another child is in the custody of her grandmother, and the remaining child is in a home for youth sex offenders.

The psychologist who evaluated the mother at the Department's request, John Azar Dickens, testified that the mother had reported that she began using drugs at the age of 14, including methamphetamines, cocaine, marijuana, "acid," and alcohol, most of which she admitted to using within 60 days of the evaluation. The mother also reported to Dickens that she began treatment for mental health issues when she was six years old; and that she had been in a number of psychiatric hospitals due to "nervous breakdowns" but currently took no medications because she could not afford them. Dickens performed psychological testing, after which he diagnosed the mother with mental illnesses, specifically poly-substance dependence, post-traumatic stress disorder, bi-polar disorder, and borderline personality disorder. Dickens assessed her ability to function in life as "significantly low." He recommended a long-term residential drug and alcohol treatment program that included mental health treatment. He testified that her prognosis would be "extremely poor" without treatment. Based on the mother's failure to complete residential treatment and her admission to using cocaine earlier in the year, Dickens opined that he would be "very concerned" about her ability to parent safely.

Meredith Burns, the child psychologist who treated H. E. M. O. from January through August 2005, testified that the child initially was having behavioral and emotional problems, such as stealing, lying, frequent temper tantrums, defiance at home and at school, nightmares, wetting incidents, and crying spells. H. E. M. O. reported that she had been sexually abused by two older siblings. Eventually,

she responded to therapy and was placed with a foster family to whom she has bonded. Burns further testified when she last saw H. E. M. O. in August, the child did not want to see her mother, and became withdrawn, worried, and anxious when the subject was raised. The child had the same reaction when Burns asked her in court if she wanted to see her mother. Finally, Burns opined that the child needs consistency and stability, which her foster parents were providing; and that she could suffer harm if her permanency needs were not met in the near future.

Moore, the mother's case manager, testified that H. E. M. O.'s foster home is a "pre-adoptive" home; that Moore visited the home four times and observed the four biological children there interact with each other and H. E. M. O. comfortably; and that H. E. M. O. appears strongly bonded with her foster parents. The foster mother has obtained psychiatric care for the child. Moore also confirmed that H. E. M. O.'s biological mother had not completed the goals of her case plan. She was resistant to entering an inpatient treatment facility and became "very volatile" in Moore's office on two occasions when Moore made referrals to facilities. The mother was asked to leave a homeless shelter because she had been so difficult to handle. She did not remain out of jail long enough for the Department to assist her with entering an inpatient facility. Also, her drug screen in March 2005 was positive for cocaine; she never achieved the goal of safe, stable housing; she only attended one parenting class despite being referred to two different programs; the last time she visited H. E. M. O. was March 5, 2005, and she visited the children only seven times out of a total of nineteen opportunities; and the mother did not keep the Department abreast of changes in her address. The court interviewed the child, and she expressed a desire to remain with her foster family. The guardian ad litem recommended terminating the mother's parental rights.

1. The termination of parental rights is a two-step procedure.[3] First, the juvenile court must find parental misconduct or inability, based on clear and convincing evidence that (i) the child is deprived, (ii) lack of parental care caused the deprivation, (iii) such causes are likely to continue, and (iv) the continued deprivation is likely to cause serious harm to the child.[4] If these four factors are satisfied, the court must then determine whether termination of parental rights is in the child's best interest, considering her physical, mental, emotional, and moral condition and needs, including the need for a secure and stable

---

[3] OCGA § 15-11-94 (a).

[4] OCGA § 15-11-94 (b) (4) (A) (i)-(iv). See *In the Interest of D. L. S.*, 271 Ga. App. 311, 312-313 (609 SE2d 666) (2005).

home.[5] Applying the four factors provided in OCGA § 15-11-94 (b) (4) (A) to this case, we find ample evidence to support the juvenile court's finding of parental misconduct or inability.

(a) *The child is deprived.* Appellant is bound by the juvenile court's prior deprivation orders, which were never appealed.[6]

(b) *Lack of proper parental care or control caused the deprivation.* There are six conditions the juvenile court must consider in making this determination, including "[a] medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child"[7] and "[e]xcessive use of or history of chronic unrehabilitated abuse of . . . narcotic or dangerous drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child."[8]

Here, the court properly determined that both conditions exist. Evidence showed that the mother suffered from medically diagnosed mental illnesses, specifically poly-substance dependence, post-traumatic stress disorder, bi-polar disorder, and borderline personality disorder. A psychologist concluded that her ability to function in life was significantly low, and without inpatient treatment, to which she was resistant, her prognosis was poor. Evidence also showed repeated, unrehabilitated, illegal drug use for which she was incarcerated after losing custody of H. E. M. O. and at the time of the hearing, causing the psychologist grave concern about her ability to parent safely. Such evidence supports a finding that H. E. M. O.'s deprivation resulted from a lack of proper parental care and control.[9] "In addition, evidence that the mother had [five] other children who were not in her care or support indicates that she would be unable to care for [H. E. M. O.]."[10]

---

[5] OCGA § 15-11-94 (a). See *In the Interest of A. L. E.*, 248 Ga. App. 213, 216 (1) (546 SE2d 319) (2001).

[6] See *In the Interest of T. P.*, 270 Ga. App. 700, 704 (1) (608 SE2d 43) (2004).

[7] OCGA § 15-11-94 (b) (4) (B) (i). See *In the Interest of S. W. J. P. D.*, 279 Ga. App. 226, 229 (1) (b) (630 SE2d 824) (2006); *In the Interest of A. L. E.*, supra at 216-217 (1).

[8] OCGA § 15-11-94 (b) (4) (B) (ii). See *In the Interest of K. A. P.*, 277 Ga. App. 794, 796-797 (1) (b) (627 SE2d 857) (2006).

[9] See *In the Interest of S. W. J. P. D.*, supra; see also *In the Interest of T. L.*, 279 Ga. App. 7, 12 (1) (630 SE2d 154) (2006) (undisputed evidence that the mother continuously used a variety of illegal drugs supported finding of deprivation); *In the Interest of B. B.*, 268 Ga. App. 858, 860 (3) (a) (603 SE2d 333) (2004) (mother's mental illness coupled with refusal to seek treatment showed parental inability).

[10] *In the Interest of A. C.*, 272 Ga. App. 165, 167 (1) (c) (611 SE2d 766) (2005), citing *In the Interest of S. L. B.*, supra at 688 (1).

Further, in cases in which the child is not in the custody of the parent who is the subject of the termination proceeding, the juvenile court also is required to consider whether the parent, without justifiable cause, failed significantly for a period of one year or longer prior to the filing of the termination petition to develop and maintain a parental bond with the child in a meaningful, supportive manner[11] or to comply with a court-ordered reunification plan.[12] Here, the evidence establishes that the mother unjustifiably failed to maintain a meaningful, supportive bond with H. E. M. O. and failed to comply with her case plan goals. The evidence showed that the mother last saw the child in March 2005, six months prior to the filing of the termination petition, and did not want to visit the child after her release from incarceration in Alabama in September 2005 because she "wasn't ready to see her . . . with not having anything positive to say." Expert testimony, and the judge's interview with H. E. M. O., established that the child did not want to see or be reunited with the mother. And the mother visited the child only seven times, despite nineteen opportunities. We find that there is clear and convincing evidence that the mother failed to develop or maintain a parental bond with H. E. M. O. for more than one year before the filing of the petition.[13]

Further, as established by the testimony of the case manager and the mother herself, the mother failed miserably at meeting the specified goals of the court-ordered reunification plan: resolving pending legal issues, refraining from further violations of the law, remaining drug free, completing a treatment program, maintaining stable housing and stable employment, and completing parenting classes, among other things.[14] Most significantly, the mother was in the custody of the sheriff's department at the time of the hearing for a probation violation due to cocaine abuse and would be homeless upon her release. The juvenile court was thus authorized to find by clear and convincing evidence that the mother significantly failed without justifiable cause for the year preceding the filing of the petition for termination of parental rights to comply with a court-ordered reunification plan.[15]

---

[11] OCGA § 15-11-94 (b) (4) (C) (i).

[12] OCGA § 15-11-94 (b) (4) (C) (iii).

[13] See *In the Interest of K. N.*, 272 Ga. App. 45, 52 (a) (2) (611 SE2d 713) (2005) (mother did not develop and maintain a parental bond where she attended only 38 out of 79 scheduled visits for which the child was made available).

[14] See *In the Interest of D. L. S.*, supra at 313 (1) (b) (failure to meet case plan goals supported finding of lack of parental care or control).

[15] See *In the Interest of A. R. A. S.*, 278 Ga. App. 608, 613-614 (2) (d) (629 SE2d 822) (2006) (mother admitted that she failed to complete case plan goals).

(c) *The cause of the child's deprivation is likely to continue.* As noted above, the mother failed to remain drug free and otherwise failed to comply with her case plan, including mandated inpatient treatment. The evidence shows that she was evicted from a shelter due to her disruptive behavior, and, when a bed became available in an inpatient treatment facility in December 2004, the mother "absolutely refused to go." "A parent's failure to comply with the requirements of court-mandated mental health counseling is a factor to be considered to determine the likelihood of whether the deprivation is likely to continue or will not likely be remedied."[16] The mother's repeated illegal drug use, resistance to inpatient, long-term treatment, and failure to maintain stable housing or employment authorized the juvenile court to find by clear and convincing evidence that the cause of the deprivation is likely to continue or will not likely be remedied.[17]

(d) *Continued deprivation is likely to cause serious harm to the child.* As to the fourth factor, that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child, the same circumstances that authorized the juvenile court's determination that the child was deprived due to lack of proper parental control or inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support for the conclusion that such continued deprivation will, or is likely to, cause serious physical, mental, emotional, or moral harm to the child.[18] Moreover,

> [w]e have held that evidence of a mother's repeated failure to remain drug free and her failure to take the steps necessary to reunite with the children was sufficient to prove that the continued deprivation would cause the child serious physical, mental, emotional, or moral harm. Additionally, it is well settled that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.[19]

As set forth above, the mother has failed to refrain from violating the law, to remain drug free, to maintain a meaningful and consistent

---

[16] (Citation and punctuation omitted.) *In the Interest of K. N.*, supra at 53 (a) (3).

[17] *In the Interest of A. B.*, 274 Ga. App. 230, 232 (617 SE2d 189) (2005) (cause of the deprivation is likely to continue where mother "highly likely" to continue using illegal drugs and failed to achieve financial and residential stability, as required by her case plan).

[18] *In the Interest of A. R. A. S.*, supra at 614 (2) (d).

[19] (Punctuation and footnotes omitted.) *In the Interest of J. S. T. S.*, 273 Ga. App. 221, 225-226 (614 SE2d 863) (2005). Accord *In the Interest of T. L.*, supra at 13 (2).

relationship with the child, to obtain stable housing, to maintain stable employment, or, in general, "to take the other steps necessary to fulfill a parent's role for the child."[20] Further, Moore, the case manager, testified that the mother's substance abuse, erratic behavior, continued resistance to treatment and refusal to acknowledge problems brought to light by professionals place H. E. M. O. at risk for further maltreatment and neglect if returned to the mother's custody. This evidence supported the juvenile court's finding that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[21]

2. *Best interest of the child.* After finding clear and convincing evidence of parental misconduct or inability, the juvenile court must then determine whether termination of parental rights is in the child's best interest, considering her physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home.[22] "The same evidence showing parental misconduct or inability may, and here does, establish this requirement."[23] In addition, given the mother's history of substance abuse and inability to care for any of her six children, as well as the progress H. E. M. O. has made in her foster home, the close bond she has developed with her foster family, and the foster mother's desire to adopt the child, the juvenile court did not abuse its discretion in finding that termination of the mother's parental rights was in the child's best interest.[24]

*Judgment affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED AUGUST 24, 2006.

*Brunt & Hood, Jason P. Hood,* for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Neel & Smith, Barry S. Haney, James E. Goad,* for appellee.

---

[20] *In the Interest of A. R. A. S.,* supra at 615 (2) (d).

[21] See *In the Interest of M. E. M.,* 272 Ga. App. 451, 455 (612 SE2d 612) (2005) (mother's failure to maintain contact with children, to support them, or to provide housing supported court's findings as to the fourth factor).

[22] OCGA § 15-11-94 (a). See *In the Interest of A. L. E.,* supra at 216 (1).

[23] (Citation and punctuation omitted.) *In the Interest of D. D.,* 273 Ga. App. 839, 842 (2) (616 SE2d 179) (2005).

[24] See *In the Interest of M. E. M.,* supra; *In the Interest of A. C.,* supra at 168 (2); *In the Interest of M. L. P.,* 236 Ga. App. 504, 510 (1) (d) (512 SE2d 652) (1999) (juvenile court has broad discretion in determining how the interest of the child is best served).